LORENZ et al. v. COLGATE–PALMOLIVE–PEET CO.

District Court, D. New Jersey.

Aug. 23, 1940.

Edward Maxson, of New York City (Charles H. Wilson, Thomas Ewing, Ernest L. Conant, and William L. Morris, all

of New York City, and Edward A. Markley, of Jersey City, N. J., of counsel), for plaintiffs.

Wall, Haight, Carey & Hartpence, of Jersey City, N. J. (Pennie, Davis, Marvin & Edmonds, Frank E. Barrows, and Roger T. McLean, all of New York City, of counsel), for defendant.

CLARK, District Judge.

This litigation has been both protracted and embarrassing. In fact, the characteristics have interacted. The difficulty has arisen from circumstances perhaps more common to patent than other law suits (cf. the genus inventor) but still unusual and, as we think, trying. One of the plaintiffs (Lorenz) is an elderly chemist, very little of whose professional life has been devoted to the art of his claimed and now contested patent. The other (Wilson) was (for he died recently) at one time an examiner in the Patent Office and later became a patent attorney. He appeared both as party and counsel since he held a 40% interest in the patent in suit. Because of his death we withhold comment on this and certain aspects of his appearance here. This attorney-plaintiff is not the only person who has invested in this invention. A chemist in the Bureau of Combustibles in Jersey City and a county engineer on Long Island also belong to the syndicate. Furthermore the abortive proceedings for settlement leave us with the impression that some of the alleged inventor's original 27% has now come into the hands of the various attorneys (except the solicitor, Mr. Maxson) who have followed one another in rather bewildering succession.

The history of the patent in the Office is even more protracted than the proceedings in this court. Dr. Lorenz, the alleged inventor, gave this account of his own conception:

"A. I first conceived this invention before July, 1913, at which time I had a consulting laboratory at 108 Wall Street, New York City.

"Q. How do you fix that date? A. I fix that date because my first wife died on June 13th, 1913, and after the funeral at Springfield, Ohio, on my way back to New York, I was thinking along different inventive lines, and the thought struck me of the application of a *vacuum* in the manufacture of soap and glycerine, and when I came back, shortly after, I mentioned my idea to two friends of mine * * *". In the matter of the Interference of Henry W. F. Lorenz v. Martin Hill Ittner, No. 69,937, filed April 14, 1936, p. 8 (italics ours).

He apparently put this conception into practice in one experiment for the production of a trivial quantity of soap. Seven years later and after being introduced to a military man reputed to have access to the defendant soap company, the learned doctor filed an application in the Patent Office on January 24, 1920. A week later, the general, the chemist from the Bureau of Combustibles of Jersey City, and Dr. Lorenz, visited the chief chemist (Dr. Ittner) of the soap company. The circumstances of this interview are exploited in unusual detail in the testimony offered by Dr. Lorenz in the interference hearings. They include some proof that Dr. Lorenz's application was shown to Dr. Ittner. A few weeks later, the latter expressed his lack of enthusiasm for the Lorenz process. This same lack of enthusiasm seems to have finally infected the Patent Office and the co-owners of the application. The Office doubted (and when the Office doubts!) any invention over the prior art and the backers correspondingly doubted any potential profits. After eight more years, Dr. Lorenz's application was abandoned on May 28, 1928. In the interference proceedings he gave a somewhat, as we think, ex post facto account of this abandonment. It involves a contradiction of the famous line that adorns the eaves of many post offices.

Whatever the reason for these dying of embers, they were fanned into flame by the issuance to Dr. Ittner of a patent (No. 1,918,603, July 18, 1933) for a soap making process. This patent issued 18 months after the application therefor. On November 8, 1934, through the attorney-owner Dr. Lorenz filed an application in the Patent Office asserting that the subject matter of patent No. 1,918,603 had been disclosed by him to Ittner in 1920. The Patent Office declared an interference and 729 printed pages of testimony were taken before a primary examiner. These proceedings closed on March 16, 1936, and on May 19, 1936, the aforesaid examiner handed down a 9 page typewritten memorandum decision. This opinion, of which more hereafter, gave the losing side 20 days in which to appeal to the reviewing body in the Patent Office. This right of appeal turned out something of a snare and delusion. The

attorney of record was the "house" patent attorney of the mother soap company in Wisconsin. The active participants in the litigation were the firm of patent attorneys now appearing before us. They represent the subsidiary or New Jersey branch of the soap business whose plant at Jersey City is the locus in quo of the events described. The names of these attorneys and their address appeared on all the papers and a member of that firm had appeared personally in the proceeding and was well-known to the examiner. Despite this fact, the latter saw fit to confine the "distribution", as they say in army orders, of his words to one copy to the Wisconsin house attorney. That gentleman being quite unconscious of the narrowness of the field of fire did nothing about it and it was not until four days after the 20 days that the defendant's "active" counsel learned of the blow. It is no wonder that they felt aggrieved and made strenuous efforts to obtain a relaxation of the 20 day limitation. The Patent Office nevertheless stood by the letter of their rules and issued to Lorenz a patent (No. 2,084,446, June 22, 1937) whose claims are a copy of the one they had already issued to Ittner. In so doing they did not attempt to deny their power to give this litigant, as they had to others, his full "day" in the Patent Office.

This brings us, then, to a critical examination of the examiner's decision. We are quite familiar with the rule of Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L. Ed. 657. We have had official occasion to refer to it. In fact at first blush of this very case, we spoke of our reliance thereon. Any thoughtful and impartial scrutiny of the examiner's views quite definitely changes all that. We are sure that the gentleman was trying to conscientiously perform his important function. We are equally sure, however, that he fell into such error that no cloak of administrative omnipotence is sufficient to uphold him.

Our examination of the matter must, of course, be made in the light of the art, the industry, and the prior art. The industry is the very ancient and civilizing one of soap making. The record contains some extremely technical articles and testimony as to its processes. Dr. Lorenz also includes some discussion in his long dispute with the Patent Office. The court availed itself of two standard text books, Brannt, The Soap Maker's Hand Book; Hurst, Soaps. What we know as soap is in chemistry the potassium salts of the fatty acids. These salts are the result of the treatment of animal and vegetable fats with lye (the alkaline carbonates, soda or potash, combined with quick lime or caustic alkalies dissolved in water). Brannt, above cited, pp. 8 et seq. The chemical process has been described:

"If these equations are studied they will be found to run on common lines, and further they show an exchange of constituents between the products which take part in the reaction; the acid portion of the fat combines with the basic metal of the alkali to form the soap, while the basic constituent of the fat, the glyceryl, $C_3H_5$, takes the hydroxyl, $HO$, of the alkali to form glycerin, or, as the chemist prefers to term it, glycerol, which is thus set free." Hurst, above cited, p. 281.

Glycerin has been found to be increasingly useful in fields ranging from destruction (dynamite) to salvation (medicine), Hurst, above cited, Chapter 7, Glycerin in Soap Lyes, p. 365. Neither Lorenz nor Ittner claim to have added anything to this existing chemical knowledge. Nor do they claim to have added much to the method of securing the reaction. For many years soap has been made by the boiling process. Hurst, above cited, p. 284, Brannt, above cited, p. 215. Both Doctors Lorenz and Ittner attempted refinements on this ancient practice. Lorenz argues, and the primary examiner agreed, that Ittner claims his identical refinement. We can make little of either the argument or its acceptance.

Dr. Ittner claims and the Patent Office agreed that it was new and genious to boil the raw material (the fats and alkalies) at temperatures beyond the melting point (up to 350° C.) in a "thinly fluid" state and under agitation by the steam used to heat. He maintained and maintains that he discovered that this does not cause decomposition (pyrolysis) as had previously been supposed. We rather question the genius aforesaid in view of some of the prior patents. We, therefore, refuse to exercise our undoubted power to give this process the stamp of our approval—at any rate in a law suit where both (rather than only one) sides desire such action. Dr. Lorenz, on the other hand, emphasized throughout his arguments in the Patent Office his use of a "vacuum". His raw materials were not only not "thinly fluid" but were in a solid mass (dry mass) and his assertion of a melting point leaves much to be desired.

Early in this opinion we italicized Dr. Lorenz's reference to a vacuum in his account of his conception of the claimed invention. As he began, so he ended. · His correspondence with the Patent Office shows an impressive consistency. In the specification he refers to vacuum five times.[1] So also, in each one of his claims he uses the word vacuum and in fact his embellishment with the adjective "high" is disapproved as tautology by the examiner. In the customary argument between examiner and putative inventor, the latter recognizes the same and only that same child of his brain. This seems to us so important that we are setting forth the written colloquy in parallel columns:

The tenor of both the applicant's and the examiner's mind thus appears quite plainly. We could understand an accusation against anyone who appropriated an idea so strenuously fought for. There is no such accusation here.

There is, however, a claim of appropriation as to the heating of the mass of raw materials. We think it fails because both the mass and the temperature are different in the Lorenz application (patent) and the Ittner patent. Once in his application (p. 4, 1920) and once in his argument to the examiner (p. 32, 1926), Dr. Lorenz refers to his soap as either "dry mass" or "thick soap mass". All his witnesses agree that this was called to his attention at the It-

|  Dr. Lorenz | Examiner |
|---|---|
| "* * * the use of a vacuum is the major consideration or feature." P. 9, lines 19–20. | "* * * to create his vacuum he (Palmer) may attach a suction pump to the cock 47 and in this way 'withdraws off the air'". P. 14. |
| "No mention is made of a vacuum pump." P. 9, lines 31–32. | "Merely recovering glycerine from soap solutions with the aid of a vacuum is old in the art." P. 15. |
| "He uses no vacuum * * *. P. 10, line 4. | "Both Bedford and Palmer show it is old in the art of soap making to saponify a soap in a container under a vacuum and to collect the distilled products drawn off during the saponification." P. 23. |
| "Applicant maintains that Palmer had no conception of the meaning of the word 'vacuum' and did not intend using a vacuum in its real meaning." P. 16, lines 4–6. | "The British patent to Bedford et al. of record discloses the preparation of a soap under the treatment of heat and by vacuum." P. 27. |
| "The separation of the glycerine is hastened by the steam in conjunction with the vacuum." P. 28. | "Claim 2 is rejected as lacking invention over the British patent to Bedford of record which discloses the preparation of soap under a vacuum and the condensation of the vapors which are drawn off." P. 30. |
| "Furthermore the distillation takes place quicker, and finally distillates are obtained of a higher concentration, since in a vacuum a fractionated condensation is more easily obtained." P. 29. | "Since it is old in the art to make soap under a vacuum there would be no invention involved in applying a vacuum pump to the outlet 'g' in the patent to Schaaf cited". P. 31. |
| "Applicant has found that when the glycerine is to be practically completely recovered from a more or less thick soap mass a somewhat higher temperature and vacuum is required * * *". P. 32, lines 26–29. | "The British patent to Bedford of record discloses the making of soap under a vacuum and drawing off the vapors". P. 38. |
|  | "To carry out the process in Edwards under a vacuum would not involve invention in view of Bedford which discloses the fact that it is a common expedient to carry on the saponification of soap under a vacuum". P. 39, |

[1] P. 4, lines 10–11; P. 4, lines 20–21; P. 4, lines 31–32; P. 5, line 1; P. 5, lines 26–27; P. 5, lines 31–32.

tner interview and was considered by all present to be a commercial objection to the product. The backers begged him to think of some way of overcoming the disadvantage. It was, it appears, only conquered by the issuance of the patent now in dispute.

The matter of temperature is equally unsatisfactory. Due to the concentration on the inventive quality of the vacuum idea, there is only passing reference to it in the Patent Office proceedings on the original Lorenz application. The claims of Dr. Ittner have made it seem important. For that reason, the plaintiffs now argue that a retort heated to 270°C. is the same thing as the mass within that retort heated to 300°C. It does not seem to us that much scientific knowledge is required to refute that proposition. If it is, the laws of conduction are in for considerable revision.

We have felt considerable sympathy for the plaintiff, Dr. Lorenz. Like many other "inventors", he has felt all along that he "had something". His feeling has received, as we think, unfair encouragement. Nevertheless, we offered our good offices and delayed our decision in the hope that he might receive something for his work. That work was not, in our opinion at least, appropriated by the defendant company. We doubt, as we have said, the validity of its process. Such as it is, however, it does not derive any merit from the common method of distillation in a vacuum.

Rather technical legal arguments were made. They were based, in our judgment, on some confusion between different statutes. Furthermore, we deemed the citation of cases decided before clarifying amendments inappropriate.

The bill of complaint will be dismissed.